UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SIEGER ENTERPRISES, INC.,                          Case No. 09-13180

                    Plaintiff,                     Stephen J. Murphy, III
vs.                                                United States District Judge

ULTRA MANUFACTURING LIMITED,                       Michael Hluchaniuk
                                                   United States Magistrate Judge
                    Defendant.
_____/

REPORT AND RECOMMENDATION
CROSS-MOTIONS FOR SUMMARY JUDGMENT (Dkt. 36, 38)

## I.    INTRODUCTION

This is a breach of contract and state statutory violation action in which,

generally, plaintiff seeks to recover sales commissions from defendant relating to a

sales representation agreement between plaintiff and defendant.  Plaintiff alleges

both a breach of contract claim and a violation of the Michigan Sales

Representative Act (MRSA).  The MRSA claim is dependent on the breach of

contract claim, given that MRSA does not supersede a parties' contract for sales

commissions.  That is, the MSRA does not create any duty to pay commissions not

otherwise provided for in the parties' agreement.  *See e.g.*, *APJ Associates v. North*

*American Philips Corp.*, 317 F.3d 610 (6th Cir. 2003), citing, *Clark Bros. Sales*

*Co. v. Dana Corp.*, 77 F.Supp.2d 837, 852  (E.D. Mich. 1999) (holding that the

statute "does not create a new obligation or impose a new duty to pay sales commissions."); *see also* Mich. Comp. Laws § 600.2961(2) ("The terms of the contract ... shall determine when a commission becomes due.").  Where a party has breached an agreement to pay sales commissions, the provisions of MRSA for additional penalties and attorney fees may become operative.  For the reasons indicated, it is recommended that both motions for summary judgment be granted in part and denied in part and it is ordered that defendant's motion to strike be denied and that defendant's motion to file sur-reply brief be granted.

## II.    PROCEDURAL HISTORY

Defendant filed its motion for summary judgment on February 15, 2011. (Dkt. 36).  Plaintiff responded to the motion on March 2, 2011, and filed its own motion for summary judgment on the same date.  (Dkt. 37, 38).  Defendant responded to plaintiff's motion for summary judgment and, in the same pleading, replied to plaintiff's response to defendant's motion for summary judgment on March 15, 2011.  (Dkt. 39).  Plaintiff filed a reply to defendant's response to plaintiff's motion for summary judgment on March 29, 2011.  (Dkt. 41).  On April 8, 2011, defendant filed a motion to strike plaintiff's reply.  (Dkt. 43).  Plaintiff responded to the motion to strike on April 19, 2011.  (Dkt. 45).  Defendant filed a reply to the response on April 25, 2011.  (Dkt. 46). The hearing on the motions for summary judgment took place on April 26, 2011.

Defendant then filed a motion for leave to file a sur-reply brief regarding its motion for summary judgment.  (Dkt. 47).  Plaintiff filed an objection to the motion on May 12, 2011.  (Dkt. 48).

This matter is now ready for report and recommendation.  For the reasons set forth below, the undersigned **RECOMMENDS** that plaintiff's motion for summary judgment be **GRANTED** in part, that defendant's motion for summary judgment be **GRANTED** in part.  For the reasons set forth below, and via separate order, the undersigned **ORDERS** defendant's motion to strike be **DENIED** (Dkt. 43) and that defendant's motion to file sur-reply brief be **GRANTED** (Dkt. 47).

## III.    RELEVANT FACTS

Defendant is a parts supplier to the major automotive companies.  At least part of defendant's business came about as a result of plaintiff's efforts, as defendant's sales representative, in contacting an automotive related company and marketing defendant's products.  The parties signed an agreement on February 22, 2000, that called for plaintiff to "sell and promote [defendant's] products" within a defined geographic area.  (Dkt. 38, Ex. 1, ¶¶ 1-2).  Plaintiff was to be compensated for its services, in part, by receiving a commission on "gross sales ... less deductions, credits, returns, discounts, and freight."  (Dkt. 38, Ex. 1, ¶ 4).  The agreement could be terminated by either party with 60 days written notice.  (Dkt. 38, Ex. 1, ¶ 10).  The agreement provided for payment of commissions following

Report and Recommendation
Cross-Motions for Summary Judgment
*Sieger Enter. v. Ultra Manufacturing*; Case No. 09-13180

termination under three different circumstances.  Commissions would continue for

30 months for all invoices on all orders or releases in effect at the date of

termination.  (Dkt. 38, Ex. 1, ¶ 11(a)).  Commissions would also be paid for all

billings for parts which were received or remitted for quotations prior to

termination provided a purchase order was received within 120 days from

termination.  (Dkt. 38, Ex. 1, ¶ 11(c)).  A third alternative for paying commissions

after termination is not relevant to this litigation.  (Dkt. 38, Ex. 1, ¶ 11b).

On November 26, 2003,  Joseph D'Angelo, a principal of defendant, sent an

email to plaintiff informing plaintiff that, apparently, the existing manner of

calculating the amount of the commission was in error and defendant intended on

changing the manner of calculation.  Specifically, defendant said that amounts for

packaging, freight and "ED&D" (engineering design and development - hereinafter

engineering costs) should not be included in the "sales" figures that plaintiff's

commission was based on.  (Dkt. 36, Ex. 3).  Plaintiff responded to the email

challenging, in part, the defendant's position on this issue.  *Id.*

On February 24, 2004, defendant sent a letter to plaintiff confirming, in

writing, that the prior agreement between the parties was being terminated.  (Dkt.

39, Ex. 3).  On April 15, 2004, defendant entered into an Early Sourcing Target

Agreement (ESTA) with the Lear Corporation regarding a variety of components

for that 2007 model year.  The first Production Purchase Order relating to the

ESTA was issued on March 14, 2006.  (Dkt. 37, Ex. 3).

## IV.   POSITIONS OF THE PARTIES

### A.   Plaintiff

Plaintiff contends that it was terminated by written notice dated February 24, 2004, therefore making the termination effective April 25, 2004.  Plaintiff asserts that the ESTA between Lear and defendant, executed on April 15, 2004, prior to termination, constituted a "purchase order" within the meaning of ¶ 11(c) of the contract between the parties, and therefore plaintiff is due commissions for all the parts subsequently produced by defendant pursuant to the Lear ESTA.

Plaintiff further contends that the amount of the commission should be based on the "gross sales" which should include the packaging and engineering costs billed to the customer.[1]

Also, plaintiff asserts that it was due commissions for 30 months following termination regarding sales, with respect to agreements other than with Lear, and that defendant did not pay the entire amount due.  Plaintiff acknowledges that defendant did pay commissions on these sales for 26 months following termination but plaintiff says it is entitled to double damages and other fees due to defendant's failure to pay those commissions in a timely fashion.

---

[1] At an earlier stage of the litigation plaintiff apparently contended that freight charges should be included in the gross sales calculation but has since abandoned that position.

B.    Defendant

Defendant contends that the Lear ESTA was not a purchase order and therefore, with respect to the Lear contract, no sales commissions were due plaintiff because no purchase order was received prior to 120 days following termination of the agreement between plaintiff and defendant, as required by ¶ 11(c) of the agreement.

Regarding the manner in which the sales commission should be calculated, defendant takes the position that packaging and engineering costs billed to the customer should not be part of "gross sales," within the meaning of the contract, and therefore plaintiff's commission should not be based on those amounts.

Lastly, defendant's position regarding the commissions that it admits were due is that the failure to pay for the full 30 months, which it now acknowledges were due, was the result of ordinary mistake and therefore the double damages provision of state law are not applicable.

V.    **ANALYSIS AND CONCLUSIONS**

A.    Standard of Review

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c); *Kocak v. Community Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005); *Thomas v. City of*

*Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005).  The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005), quoting, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986); *see also Tucker v. Union of Needletrades Indus. & Textile Employees*, 407 F.3d 784, 787 (6th Cir. 2005).  The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 296 (6th Cir. 2005).

Under Federal Rule of Civil Procedure 56, a party asserting a fact that cannot be or is not genuinely disputed must support that assertion by citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admission, interrogatory answers, or other materials; or a showing that the materials cited do not establish the absence or presence of a genuine dispute or that an adverse party cannot produce admissible evidence to support the fact.

Fed.R.Civ.P. 56(c)(1).[2]  An issue is "genuine" for summary judgment purposes if a

"reasonable jury could return a verdict for the nonmoving party."  *Henson v Nat'l*

*Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994).

    B.    <u>Significance of ESTA</u>

Plaintiff claims it is entitled to be paid sales commissions arising out of

defendant's sale of certain automotive parts under what has been referred to as the

Lear RT program.  Plaintiff relies on the provision of the contract that existed with

defendant, ¶ 11(c), which provides that commissions are due after termination of

the agreement for "all billings for parts which were received or remitted for

quotations prior to the termination ... provided a *purchase order* is received within

120 days from the date of termination ... ." (Emphasis added).  Defendant contends

no purchase order was received from Lear during the relevant time period and

_____

[2] Formerly, "Rule 56(e) require[d] that sworn or certified copies of all papers
referred to in an affidavit must be attached to or served with that affidavit ... To be
admissible, documents must be authenticated by and attached to an affidavit that
meets the requirements of Rule 56(e) and the affiant must be a person through
whom the exhibits could be admitted into evidence."  *Johnson v. Memphis City
Schools*, 2010 WL 1957267, *2 (W.D. Tenn. 2010), quoting, 10A Charles A.
Wright, Arthur R. Miller and Mary Kay Kane, Federal Practice & Procedure, §
2722, at 379-80 & 382-84 (1988). According to the Advisory Comments to the
recent amendments, this specific requirement was omitted because as unnecessary
given the requirement in subdivision (c)(1)(A) that a statement or dispute of fact be
supported by materials in the record.  Comments, 2010 Amendments to
Fed.R.Civ.P. 56, subdivision (c). Notably, the language changes have not changed
the standard itself.  *Id*. ("The standard for granting summary judgment remains
unchanged.").

therefore no commissions are due.

The basic facts relevant to this issue are not in dispute.  Negotiations between Lear Corporation and defendant began while the sales representation agreement between plaintiff and defendant was still in effect.  On February 2, 2004, a representative of Lear emailed Gary Scypta, a principal of plaintiff, regarding the Lear program and indicated that he did not have the approval to enter into an agreement with defendant and referred Scypta to his supervisor, Frank Gregor.  (Dkt. 38, Ex. 5).  Gregor sent Scypta an email on February 19, 2004, and said he was willing to consider defendant "within the bidding for the RT I/P components" and attached a "preliminary DESIGN ESTA" that was to be completed and returned to Gregor a few days later.  (Dkt. 38, Ex. 6). The termination letter sent to Scypta, dated February 24, 2004, indicated that plaintiff should "stop calling or soliciting ... customers."  (Dkt. 36, Ex. 5).  Despite the direction in the termination letter Scypta returned some documents to Gregor on March 8, 2004, that were referred to as the "revised RT quote."  The email that the documents were attached to invited Gregor to further discuss "piece price, tooling or ED&D costs."  (Dkt. 38, Ex. 7).

Gino Mastronardi, on behalf of defendant, apparently took over the negotiations with Lear and sent an email to Gregor on March 12, 2004, with a resubmitted quote for the project.  (Dkt. 39, Ex. 4).  Three days later, Gregor

advised Mastronardi by email that another source for the "design ESTA" was being pursued but defendant would be considered "at the time of the competitive bidding for the award of the production."  *Id.*

On April 15, 2004, the Early Sourcing Target Agreement (ESTA) between Lear and defendant was signed.  (Dkt. 39, Ex. 5).  It is not clear what happened between March 12, 2004, and April 15, 2004 that changed the status of the agreement between Lear and defendant such that the ESTA was executed on April 15, 2004.  Defendant argues that it "redoubled" its efforts to obtain this business with Lear and claims that it submitted additional proposals to Lear but there is no documentary evidence of that in this record.[3]  (Dkt. 39, p. 14).  Plaintiff's termination was effective on April 25, 2004.  Based on the evidence produced by the parties in conjunction with these motions, no parts were  produced by defendant for Lear, relevant to the ESTA, until after the Production Purchase Order was issued by Lear on March 14, 2006.  (Dkt. 38, Ex. 4).  The affidavit of Mr. Mastonardi states that the ESTA was not an agreement by Lear to purchase component parts from defendant, that the ESTA obligated defendant to "undertake preliminary design and engineering work" associated with the RT program and that Lear reserved the option of awarding the production of the parts to some other

---

[3]  No documents submitted by either party relate to these facts and the affidavit of Mr. Mastronardi does not address exactly what took place during this time period.  (Dkt. 39, Ex. 6).

supplier after the design work was completed.  (Dkt. 39, Ex. 6, ¶¶ 10-11).

Defendant seeks to supplement its argument that the 2004 ESTA was not a purchase order, or its equivalent, through an affidavit of Mr. Mastronardi attached to its proposed sur-reply brief that specifically asserts that the 2004 ESTA was for design work only and a "formal quote" for the production of parts had to be submitted in order to obtain a contract to actually build the parts, as opposed to merely designing them.  The affidavit also asserts that other suppliers submitted "formal quotes" on the same parts but that the production contract was awarded to defendant.  (Dkt. 47, Ex. 4, ¶¶ 5-11).  The affidavit further claims that defendant, subsequent to the ESTA in question here, entered into another ESTA with Lear and did not get the contract to actually produce the parts.  *Id*., ¶¶. 13-20.  Plaintiff objects to defendant's request to supplement the record in this case with a sur-reply brief filed after oral argument.  (Dkt. 48).

In its reply to defendant's response to plaintiff's motion for summary judgment, plaintiff attempts to bolster its argument that the ESTA is the equivalent of a purchase order with an affidavit from Allan Kochanski, a former employee of Lear.  Mr. Kochanski stated that in 2004 Lear used a "purchase order" or an "Early Sourcing Target Agreement" as "contract forms for their arrangements with suppliers."  (Dkt. 41, Ex. 2, ¶ 3).  Defendant challenges plaintiff's ability to rely on the Kochanski information in its motion to strike.  (Dkt. 43).

At the threshold, the parties' challenge to the use of certain evidence must be considered in order to properly limit the decision to the universe of information permitted for such motions.  As indicated earlier, a determination of whether facts can be considered genuinely contested must be based on materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admission, interrogatory answers, or other materials. The first of these questions arises from the defendant's motion to strike plaintiff's reply brief.  The motion is based on defendant's claim that (1) the reply exceeds the page limit, (2) the reply includes an affidavit from someone who plaintiff did not disclose earlier in discovery, and (3) the reply raises new factual issues.[4]

Plaintiff's summary judgment motion contains three claims.  The claims are (1) that plaintiff is entitled to be paid a commission on packaging and engineering costs, (2) that plaintiff is entitled to be paid a commission for the parts sold to Lear under the RT program because the 2004 ESTA "constitutes a commitment by Lear to purchase parts from" defendant and therefore is a "purchase order or like sales contract" entered into prior to 120 days following the effective date of plaintiff's termination, and (3) plaintiff is entitled to certain damages under state law,

---

[4]  Defendant's argument that the reply brief exceeds the page limit for replies has potential merit but the undersigned elects to overlook the violation in light of the present circumstances.  This decision should not be viewed as a standard practice as the undersigned strongly believes in the enforcement of such rules in most cases.

including actual attorney fees.  (Dkt. 38).

Defendant's response to the motion was that (1) the terms of the sales representation agreement excludes packaging and engineering costs from the scope of gross sales, (2) that the 2004 ESTA was for "preliminary design and engineering services only" and not a purchase order within the meaning of the sales representation agreement,  and (3) no additional damages are due plaintiff under state law.  (Dkt. 39).

Plaintiff's reply brief included the affidavit of Allan Kochanski, noted earlier, that described business practices of Lear during 2004 and specifically noted that an ESTA-type agreement was one possible "contract form"used by Lear in conducting business with a supplier.  (Dkt. 41, Ex. 2).  It is this additional factual information to which defendant objects.  Plaintiff's response to this objection is that "the need for Mr. Kochanski's testimony was not apparent until after Defendant had filed its response to Plaintiff's Motion for Summary Judgment." (Dkt. 45, pp. 1-2).  Plaintiff's explanation for not disclosing Mr. Kochanski as a witness at an earlier stage was that defendant did not disclose the 2004 ESTA until late in the discovery process and Mr. Kochanski was not considered a witness until defendant responded to plaintiff's motion for summary judgment and took the position that the ESTA was not a purchase order by Lear.

In late January of 2010, plaintiff had sought discovery of various items from

defendant including "early sourcing documents, purchase orders, releases, invoices or other evidence of sales with respect to the RT program." When no documents were produced in response to this request plaintiff filed a motion to compel in May of 2010. (Dkt. 20). An initial order granting that motion was entered on July 15, 2010 (Dkt. 25) but that order was subsequently vacated and a second order entered on September 27, 2010, granting the motion as to the documents noted above. (Dkt. 31). Documents were produced by defendant pursuant to the order on October 22, 2010, and these documents presumably included the 2004 ESTA. (Dkt. 45, p. 7).

In January of 2011 plaintiff responded to an interrogatory from defendant relating to witnesses with knowledge of its claims and did not include Mr. Kochanski's name. *Id.* On March 2, 2011, more than three months after receiving a copy of the 2004 ESTA, plaintiff filed its motion for summary judgment claiming, in part, that the 2004 ESTA was the equivalent of a purchase order and, as a result, that plaintiff was entitled to a sales commission for all the parts ultimately sold to Lear for that program. (Dkt. 38). While documents and an affidavit from Gary Scypta were attached to the motion, there was no identification of Mr. Kochanski or anyone else from Lear as providing supporting information relevant to the motion. The gist of plaintiff's argument was based on the general circumstances associated with the document and did not include any direct or

personal evidence that the ESTA was viewed by the parties to the agreement as the equivalent of a purchase order. (Dkt. 38, pp. 1-3). The Kochanski affidavit offered a completely different evidentiary perspective as to the significance of the ESTA, indicating that, based on the personal knowledge of Mr. Kochanski, an ESTA might have been the equivalent of a purchase order.

Defendant's motion for summary judgment had been filed on February 15, 2011. (Dkt. 36). Defendant's motion had contended, generally, that there was no purchase order during the relevant time period such that no commission was due to plaintiff. *Id.* Defendant had previously filed an initial motion for summary judgment in March of 2010, which was later withdrawn, that had made a similar argument with respect to the existence of a purchase order. (Dkt. 10). In its objection to defendant's motion to strike plaintiff stated it did not know Mr. Kochanski would be a witness in this case until defendant denied the ESTA was a purchase order in its response to plaintiff's motion for summary judgment combined with a reply to plaintiff's response to defendant's motion for summary judgment. It cannot reasonably be argued that plaintiff was surprised by defendant's position. Defendant had denied at every opportunity that any purchase order was executed during a time when plaintiff could have claimed entitlement to a commission and defendant had never indicated that the 2004 ESTA could possibly be considered a purchase order. Plaintiff had no legitimate basis to

assume that defendant would take a position other than that the ESTA was not a purchase order.

Rule 37(c)(1) provides that if a party fails to "provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Plaintiff's justification for the late disclosure of the name and information provided by Mr. Kochanski is not particularly persuasive. While it is clear that defendant did not disclose the existence of the 2004 ESTA as early as it might have, plaintiff was aware of the ESTA for at least three months prior to these motions being filed and, without question, plaintiff was aware of Lear's involvement in this transaction and could have inquired directly of Lear as to the existence of a purchase order or early sourcing document or some other evidence of an order for parts during the relevant time frame in order to support its claim for a commission.

Although defendant is the moving party here, a "party requesting exclusion under Rule 37(c)(1) need not show prejudice; rather, the burden is on the non-moving party to show that the non-disclosure was harmless or substantially justified. When the non-moving party fails to show as much, case law suggests the exclusion is mandatory." *SPS Corp. v. Bartec USA*, 574 F.Supp.2d 748, 756-57 (E.D. Mich. 2008). Plaintiff has not demonstrated the harmlessness of the

Kochanski affidavit and defendant argues prejudice based on its inability to depose or otherwise conduct discovery as to that information so the late disclosure of Mr. Kochanski cannot reasonably be determined to be harmless.

Before resolving this issue, the other reasons defendant relies on to support its motion to strike plaintiff's reply will be addressed. Defendant argues that the Kochanski affidavit was new information raised for the first time in a reply and is therefore, improper. Defendant does not specifically address the merits of this issue but argues that it did not recognize the need for an affidavit from Mr. Kochanski until defendant responded to plaintiff's motion for summary judgment on March 15, 2011, and denied that an ESTA was the same as a purchase order. (Dkt. 45, p. 9).

Defendant relies on authority that stands for the proposition that issues raised for the first time in a reply brief should not be considered. *See Ziba v Kcira*, 2010 WL 4636635 (E.D. Mich. 2010) (new factual and legal issues raised in a reply to a motion to dismiss not considered). The real issue is whether it is appropriate to grant a motion for summary judgment where new issues are raised in a reply to a motion for summary judgment without allowing the nonmoving party an opportunity to respond. "It is only logical that the purposes of notice and opportunity to respond extend ... to the situation where the moving party submits in a reply brief new reasons and evidence in support of its motion for summary

judgment, and require a district court to allow the nonmoving party an opportunity to respond." *Seay v. TVA*, 339 F.3d 454, 481-82 (6th Cir. 2002) (district court erred in granting motion for summary judgment on new issues raised in reply brief without giving nonmoving party opportunity to respond).

Defendant here did not request an opportunity to respond directly to plaintiff's reply, pursuing a motion to strike the reply as an alternative remedy. However, defendant does seek to file a sur-reply brief, ostensibly as a result of issues that arose during oral argument, but the proposed brief and its attachments implicate the issues plaintiff raised in its reply with the Kochanski affidavit. Plaintiff challenges defendants right to file a sur-reply brief on the basis of the claim it would not be fair to permit defendant to "advance a new theory of defense that is apparently based upon documents that Defendant has claimed in pleadings submitted by it in this case do not exist." (Dkt. 48, p. 3). Plaintiff's objection specifically refers to documents described in the affidavit of Mr. Mastronardi attached to the motion to file the sur-reply that were never produced in discovery. (Dkt. 47-2, pp. 36-39). These documents may be described in the affidavit but they are not attached to the affidavit and it is not clear whether they currently exist.

The undersigned recognizes that it has discretion in deciding what information should be considered in deciding these motions for summary judgment. The undersigned further believes that it is a better practice to consider

more, rather than less, information in making such a decision as long as considerations of fairness are taken into account. Given these factors, the undersigned denies defendant's motion to strike plaintiff's reply to defendant's response to plaintiff's motion for summary judgment and also denies plaintiff's objection and request to strike defendant's motion to file its sur-reply brief. The undersigned believes it would be unfair to allow defendant to file a reply raising new factual issues (the Kochanski affidavit) without giving defendant the opportunity to respond. Even though defendant does not seek to file the sur-reply brief as a direct response to the plaintiff's reply, the sur-reply allows defendant to fairly respond to the allegations in the Kochanski affidavit attached to plaintiff's reply.

Having defined the parameters of the information to be considered in deciding these cross-motions for summary judgment, the first question to be considered is whether the 2004 ESTA is the functional equivalent of a purchase order. If it is the equivalent of a purchase order, plaintiff would be entitled to be paid a commission on the sales of related parts to Lear under ¶ 11(c) of the sales representation agreement between plaintiff and defendant.

In support of its argument that the ESTA is really a purchase order, plaintiff submits a copy of the ESTA, a copy of a Production Purchase Order from 2006, a series of emails between Gary Scypta, a principal of plaintiff, and individuals at

Lear, an affidavit by Scypta, and the Kochanski affidavit. Defendant, in opposing

plaintiff's motion and supporting its own motion, submits portions of the

deposition transcript of Mr. Scypta, copies of relevant documents, copies of emails

relating to the negotiations with Lear, and several affidavits by Mr. Mastronardi.

"The court shall grant summary judgment if the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as

a matter of law." Rule 56(a). When deciding a motion for summary judgment, the

evidence must be viewed in the light most favorable to the nonmoving party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). In that both parties

have filed for summary judgment on the same issues that standard becomes

difficult to apply in these circumstances. An issue is "genuine" for Rule 56

purposes if a "reasonable jury could return a verdict for the nonmoving party."

*Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994).

Notably, however, in a breach of contract action, the plaintiff has the burden of

proving that a breach occurred. *Votar, LLC v. HS R and A Company, Ltd.*, 370

Fed.Appx. 583 (6th Cir. 2010), citing, *Keywell & Rosenfeld v. Bithell*, 254

Mich.App. 300, 657 N.W.2d 759, 790-91 (2002). With this principle in mind, a

moving party without the burden of proof needs only show that the opponent

cannot sustain his burden at trial. *See Morris v. Oldham County Fiscal Court*, 201

F.3d 784, 787 (6th Cir. 2000). In contrast, a moving party with the burden of proof

faces a "substantially higher hurdle." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002). Accordingly, a summary judgment in favor of the party with the burden of persuasion "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

Reviewing the evidence submitted by the parties on this issue, the undersigned concludes that none of the evidence submitted by plaintiff, even when viewed in the light most favorable to plaintiff, establishes that the 2004 ESTA was the equivalent of a purchase order. Arguments that the 2004 ESTA has some of the earmarks of a purchase order does not establish that it functioned as a purchase order in these particular circumstances. Counsel for plaintiff contended during oral argument that the Kochanski affidavit established that an ESTA was an "award of business." However, the undersigned's interpretation of that affidavit does not go as far plaintiff needs to go in this case. Mr. Kochanski apparently was employed by Lear during relevant time periods but, by acknowledgment, does not have specific knowledge of this particular arrangement between Lear and defendant. His affidavit states that Lear used ESTAs and purchase orders as "contract forms" but that ESTAs and purchase orders were not used, "as a matter of course," to order parts from "more than one supplier." Also, the affidavit stated the ESTA "signified the sourcing of the business to the supplier, subject to the supplier's

ability to meet all of the targets set forth in the ESTA." (Dkt. 41, Ex. 2). While the affidavit has some evidentiary weight, the lack of personal knowledge by Kochanski as to this particular agreement and the conditional nature of the ESTA as described in the affidavit (its use was described in general terms) does not create a genuine issue of fact in light of the other evidence in the case.

That other evidence includes the affidavits of Mr. Mastronardi (Dkt. 36, Ex. 4, Dkt. 39, Ex. 6,  Dkt. 43, Ex. 2, Dkt. 47, Ex. 4), as well as emails that were attached to defendant's pleadings (Ex. 39, Ex. 4).  In his affidavits, Mr. Mastronardi states: (1) that he is the Director of Program Management for Ultra Manufacturing and that there were no purchase orders received for the Lear RT program through August 23, 2004 (Dkt. 36, Ex. 4, ¶¶ 2,10); (2) that the ESTA with Lear was entered into on April 15, 2004, (3) that the ESTA did not provide for the purchase of parts by Lear - only design and engineering work - and that the decision by Lear as to where the parts would be made was to be made later and was not made until 2006 (Dkt. 39, Ex. 6, ¶¶ 8-13); (4) that Mastronardi was the primary person dealing with Lear on behalf of Ultra and he never had any contact with Mr. Kochanski (Dkt. 43, Ex. 2, ¶¶ 5,7); and (5) that the design and engineering work called for by the ESTA was completed by Ultra and thereafter formal quotes were submitted for the production of the parts by Ultra and other potential suppliers with the production ultimately being awarded to Ultra via a Production Purchase Order.

Additionally, the affidavit stated that in 2005, Ultra had signed a different ESTA with Lear and was not subsequently awarded the contract to produce the parts. (Ex. 47, Ex. 4, ¶¶ 6-20).  These facts unequivocally indicate that the 2004 ESTA was for the design and engineering work associated with certain parts that Lear was attempting to obtain.  The ESTA did not include an obligation on the part of Lear to purchase parts from defendant as would be necessary for the ESTA to be viewed as the functional equivalent of a purchase order.  The specific terms of the ESTA also indicate that the parties did not intend that the contract was necessarily for the production of the parts.  Under the section of the contract entitled "Target Pricing Detail" appear the phrases "Should the production of parts not be awarded," "It is  understood that if awarded the production of components listed above," and "Lear will perform a competitive bid once design has been completed ... ."  (Dkt. 38, Ex. 3, pp. 7-8).

This conclusion is supported by the email sent on March 15, 2004, by Frank Gregor on behalf of Lear to Mr. Mastronardi in which Gregor informs Mastronardi that, as of that moment, Lear intended on having someone other than Ultra do the "design ESTA" but would "consider Ultra at the time of competitive bidding for the award of the production."  (Dkt. 39, Ex. 4).  This email demonstrates that Lear considered the design/engineering aspects of the transaction different than the production aspect, consistent with the statements of Mastronardi.  The Kochanski

affidavit states that Lear, at the time of these events, did not "as a matter of course" issue an ESTA or purchase order to more than one supplier but that, even viewed in the light most favorable to plaintiff, does not contradict the direct statements of Mastronardi and the Gregor email that the design was separate from production.[5] It may well be that in most instances the supplier who does the design work gets the production contract as well, but that probability, assuming it was true, does not make the ESTA a contract for production, or in other words a purchase order.

Based on these conclusions the undersigned **RECOMMENDS** that defendant's motion for summary judgment on this issue be **GRANTED** and plaintiff's be **DENIED**.

---

[5]  In its reply brief to defendant's answer to plaintiff's motion for summary judgment, plaintiff makes a number of factual claims including, for example, that defendant was the only supplier regarding the Lear RT program and "did not thereafter compete with any other supplier for this business."  (Dkt. 41, p. 10). Plaintiff's claims similar to this without any support in the record are simply inadequate to establish facts for this type of motion or to refute factual allegations made by defendant that are supported by the record.

C.    <u>Commission</u>

Plaintiff also seeks summary judgment on the issue of how any commission it is entitled to should be calculated.  Defendant asks for the same relief with a different result.  Plaintiff's argument is that ¶ 4 of the Sales Representation Agreement provides for a commission to be paid to plaintiff on "gross sales ... less deductions, credits, returns, discounts, and freight on shipments."  (Dkt. 38, Ex. 1).  Plaintiff further contends that if there is any inconsistency between this language and any other provisions of the contract the language in ¶ 4 should be followed.  Also, to the extent there is ambiguity with other provisions of the contract any interpretation should be construed against the party who drafted the contract, which in this case is defendant.

Defendant argues that the contract should be interpreted as a whole and ¶ 1 of the contract provides that plaintiff contracted to sell "products" of the defendant and "products" is defined, in Exhibit B to the contract, as "Plastic Components & Assemblies (Excludes all Prototypes, Design, Development, & Tooling Costs)."  According to defendant, when this definition of "products" is read into ¶ 4 of the contract relating to commissions, any costs associated with design or engineering as well as packaging are excluded from the "gross sales" calculation and therefore the commission is not based on that.

The parties agree that Michigan law controls the interpretation of the

25

contract.  Under Michigan law, the "'cardinal rule in the interpretation of contracts is to ascertain the intention of the parties.  To this rule all others are subordinate.'" *Shay v. Aldrich*, 487 Mich. 648, 660 (2010), quoting *McIntosh v. Groomes*, 227 Mich. 215 (1924).  If the language of a contract is unambiguous, it is to be construed according to its plain meaning.  *Grosse Pointe Park v. Mich. Muni Liability & Prop. Pool*, 473 Mich. 188, 197-98 (2005).  If the language of the contract is ambiguous, courts may consider extrinsic evidence to determine the intent of the parties.  *Id*.  One portion of the contract may not be ignored in order to avoid finding an ambiguity or for the purpose of created an ambiguity.  *Klapp v. United Ins. Group Agency*, 468 Mich. 459, 467 (2003).  A contract should be construed so as to give effect to all words and phrases to the extent that is practical. *Id*.

In the present case, both parties claim the contract is unambiguous regarding the manner in which the commission should be calculated.  Plaintiff contends the commission is determined by only considering ¶ 4 of the agreement.  That paragraph states the commission is based on "gross sales ... less deductions, credits, returns, discounts, and freight on shipments."  Defendant, on the other hand, argues that the commission should be based on sales of "products" as defined in Appendix B to the agreement as plastic components and assemblies but excludes prototypes, design, development and tooling costs.

Paragraph 4 makes direct reference to other portions of the contract in order to incorporate the rate of the commission as stated in Appendix C and to limit the commission to the customers identified in Appendix D.  No reference is made to Appendix B.  The undersigned concludes that there is no direct reference to Appendix B because there is no need to refer to that other portion of the contract as suggested by defendant.  Defendant is correct in contending that plaintiff contracted to sell defendant's products, which is defined in Appendix B.  However, the amount of the commission was based on the "gross" sales of those plastic components and assemblies less only deductions, credits, returns and freight.  "Gross" sales means total sales, which, in this context, means the total amount billed to defendant's customers as the cost of the plastic components and assemblies.  If that total amount includes the shipping costs and the amortized design, engineering and tooling costs, then it is part of the "gross" sales.[6]  To not include that is to not give effect to the word "gross" in ¶ 4.  Defendant's interpretation of the contract ignores the concept of "gross" in ¶ 4.  If "gross" did not appear in ¶ 4, defendant's argument might have more traction, but that word is present and cannot be ignored.

It should be noted that paying a commission on the "gross" sales including

---

[6]  The practice of amortizing the cost of design, engineering and tooling costs into the price of the parts actually sold seems contemplated by the terms of the ESTA.  (Dkt. 38, Ex. 3, p. 7).

packaging and engineering costs appeared to be what the parties actually did following the execution of the contract until defendant unilaterally changed that practice in the fall of 2003. A party cannot unilaterally alter a contract. *Quality Products v. Nagel Precision*, 469 Mich 362, 364 (2003). The early conduct of the parties in effectuating the agreement would seem to be a very strong indication of the parties' "intent" with respect to this provision of the contract at the time it was signed.

Further, to the extent there is any ambiguity in these contractual terms, the terms of the contract are to be strictly construed against the party who drafted the contract and in this case, that is defendant. *Shay v. Aldrich*, 487 Mich. 648, 673 (2010).

Based on the above analysis, the undersigned **RECOMMENDS** that plaintiff's motion for summary judgment on this issue be **GRANTED** and defendant's motion for summary judgment be **DENIED**. Plaintiff's motion for summary judgment was for a ruling on liability only and therefore, the damage determination will have to await a subsequent motion and hearing.

D.     Damages for Failure to Pay Commission

Plaintiff's complaint seeks damages, based on a breach of contract theory and pursuant to the Michigan Sales Representative's Commission Act, Mich. Comp. Laws § 600.2961, based on: (1) defendant's alleged failure to pay

commissions through October of 2006 (30 months following termination) on the sale of certain unspecified products, and (2) defendant's failure to pay commissions as to the sale of other products (subsequently identified as the Lear RT program) for which purchase orders were received prior to 120 days from the termination of the sales representation agreement between the parties.  Plaintiff also claims that the sales commission should be based on the "gross sales price," which should include the "cost of packaging and ED&D" but that after November of 2003, defendant deducted the "packaging costs and freight from the price of the parts, thereby reducing the commission due" plaintiff.  (Dkt. 1-3, pp. 3-5). Plaintiff claims that defendant's refusal to pay the full commissions constituted a breach of "the Agreement" as well as a violation of the MSRCA.  *Id*.

Sales commissions covered by the MSRCA that are due at the termination of the agreement must be paid within 45 days of termination or within 45 days of when they are due if that date is later than the date of termination.  Mich. Comp. Laws § 600.2961(4).  An employer/principal who fails to pay the commission when due is liable for actual damages caused by the failure to pay and, if the failure to pay is "intentional" the employer is liable for "2 times the amount of commissions due but not paid as required by this section or $100,000, whichever is less."  Mich. Comp. Laws § 600.2961(5)(a) and (b).  The "prevailing party" in this type of cause of action is entitled to an award of reasonable attorney fees and court

costs.  Mich. Comp. Laws § 600.2961(6).

Plaintiff claims it is entitled to $3,212 in compensatory damages for defendant's failure to pay the commissions on the sale of unspecified items for the full 30 months (an amount apparently defendant agrees with) as well as for damages for defendant's failure to pay commissions on the sale of products under the Lear RT program.  Plaintiff also claims that the amount of the commissions should be based on "gross sales" as addressed above.  Plaintiff contends it is entitled to an additional award of double damages for unpaid commissions because defendant's failure to pay was "intentional" and that it is entitled to an award of attorney fees and court costs because it is the "prevailing party" in this action.

In order for defendant's failure to pay commissions to be "intentional" plaintiff need not prove bad faith on the part of defendant.  *Kenneth Henes Special Projects v. Continental Biomass*, 468 Mich 109, 114-15 (2003).  A good faith belief on the part of the principal is not a defense to a claim under this section of state law.  *Id.*  An act is done intentionally if it is done deliberately, on purpose, without regard to whether the principal believed, "reasonably or otherwise, that the commission was owed."  *Id.*  In this case, with respect to the defendant's failure to pay the commission on the unspecified products for the last four months of the 30 month period following termination, there would not appear to be any dispute that the failure to pay was deliberate in that defendant knew they were stopping

payments when they did.  Defendant claims, without supporting affidavit or other

documentation, that the failure to pay was a "mistake."  (Dkt. 39, p. 21).  In fact,

defendant alleges it was a mutual mistake in that when Mr. Scypta was deposed he

said he did not object to the termination of payment when defendant stopped

paying due to his own "misinterpretation" of the agreement.  (Dkt. 39, pp. 21-22).

This is not a situation where the parties conferred and agreed that no commissions

were due after June of 2006 or that plaintiff said something to cause defendant to

rely on the fact that no commissions were due after June of 2006.  The mere fact

that defendant informed plaintiff that it determined no commissions were due after

June of 2006, and plaintiff did not object, does not mean that the act of defendant

was not intentional.  The "clear and unambiguous language of the statute penalizes

*intentional failure to pay*, without regard to the motivation of the principal [and

the] only cognizable defense to a double-damages claim is if the failure to pay the

commission were based on inadvertence or oversight."  *Kenneth Henes*, 468 Mich.

at 118 (emphasis in original).  Plaintiff has established that the commissions were

not paid and defendant has not come forward with facts, demonstrated by any

portion of the record, that could persuade a jury that the failure to pay the

commission was due to inadvertence or oversight.  A non-movant is not entitled to

a trial on the "hope" that a jury will disbelieve factually uncontested evidence.

*Fogerty v. MGM Group Holdings*, 379 F.3d 348, 353 (6th Cir. 2004).   Plaintiff, in

addition to compensatory damages in the amount of $3,212, is entitled to a further award of double damages on that claim. For the reasons stated above, plaintiff is not entitled to any award as to the claim of unpaid commissions regarding the Lear RT program.

The undersigned **RECOMMENDS** that plaintiff's motion for summary judgment as to its entitlement to an award of double damages regarding the agreed unpaid commissions be **GRANTED** and otherwise the motion should be **DENIED**, except that plaintiff may be able to establish that it is entitled to double damages regarding the additional commissions that it claims entitlement to where defendant improperly calculated the commissions as noted above.

E.     Attorney Fees

With respect to plaintiff's claim for attorney fees pursuant to Mich. Comp. Laws § 600.2961(6), plaintiff must establish it is the "prevailing party" under this section. A prevailing party is a party "who wins on all the allegations of the complaint or on all of the responses." Mich. Comp. Laws § 600.2961(1)(C). "[A] party cannot be deemed a prevailing party entitled to reasonable attorney fees and court costs unless that party is found to have prevailed fully on each and every aspect of the claim ... asserted under the SRCA." *Peters v. Gunnell*, 253 Mich.App. 211, 223 (2002). Plaintiff sought damages for unpaid commissions regarding the four month period relating to the sale of unspecified product as well

as for the unpaid commissions regarding the Lear RT program. Plaintiff also sought additional commissions based on the claim that defendant had not properly calculated the commissions paid since November of 2003.  Under the present analysis, plaintiff did not "win" all of those arguments and therefore cannot be considered the "prevailing party" under this section of state law.  Plaintiff attempts to position itself similarly to the plaintiff in *King v. Triton Industries*, 2009 WL 4639334 (W.D. Mich. 2009).  However, in *King* the plaintiff "won" on the claim under the MSRCA but did not "win" on some of the alternate theories for the same damages.  The district judge ruled that as long as plaintiff "won" on the MSRCA claim he was entitled to be considered the "prevailing party" under the statute even if not successful on the other theories relating to the same claim.  Here, plaintiff was seeking two distinct awards for sales commissions under the MSRCA as well as additional commissions where incorrect criteria was used by defendant to calculate the commissions and the undersigned is recommending that he be awarded two but not all three of those claims.  As a result, plaintiff has not "prevailed fully on each and every aspect of the claim ... asserted under the SRCA."  *Peters*, 253 Mich.App. at 223.  Under the terms of the statute, plaintiff is not entitled to an award of attorney fees and the undersigned **RECOMMENDS** that defendant's motion for summary judgment on this issue should be **GRANTED**.

## VI.   RECOMMENDATION

For the reasons set forth below, the undersigned **RECOMMENDS** that plaintiff's motion for summary judgment be **GRANTED** in part, that defendant's motion for summary judgment be **GRANTED** in part.  For the reasons set forth below, and via separate order, the undersigned **ORDERS** defendant's motion to strike be **DENIED** (Dkt. 43) and that defendant's motion to file sur-reply brief be **GRANTED** (Dkt. 47).

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and

Report and Recommendation
Cross-Motions for Summary Judgment
*Sieger Enter. v. Ultra Manufacturing*; Case No. 09-13180

Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed.R.Civ.P. 72(b)(2), Local Rule 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: August 31, 2011

s/Michael Hluchaniuk
Michael Hluchaniuk
United States Magistrate Judge

## CERTIFICATE OF SERVICE

I certify that on August 31, 2011, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send electronic notification to the following: Kieran F. Cunningham, Adam J. Wienner, and Mark A. Aiello.

s/Tammy Hallwood
Case Manager
(810) 341-7887
tammy_hallwood@mied.uscourts.gov