UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SIEGER ENTERPRISES, INC.,

    Plaintiff,

v.

ULTRA MANUFACTURING LIMITED,

    Defendant.
                                      /

Case No. 09-cv-13180

HONORABLE STEPHEN J. MURPHY, III

**ORDER ADOPTING IN PART AND REJECTING IN PART THE REPORT
AND RECOMMENDATION,** (docket no. 50) **OVERRULING IN PART
AND SUSTAINING IN PART THE OBJECTIONS,** (docket nos. 51 & 53)
**AND GRANTING IN PART AND DENYING IN PART MOTIONS
FOR SUMMARY JUDGMENT** (docket nos. 36, 38)

Sieger Enterprises, Inc. ("Sieger"), a now-defunct sales firm that represented automotive parts manufacturers in North America, entered an agreement with the Canadian company Ultra Manufacturing Limited ("Ultra") in 2000 to serve as Ultra's exclusive sales representative for its plastic components and assemblies. The agreement ended in 2004. Sieger claims that under the terms of the contract, it is entitled to sales commissions from Ultra emanating from an agreement Ultra entered with Lear Corporation ("Lear") after their contractual relationship with Sieger ended. It also claims Ultra improperly calculated their commissions. Sieger brought this lawsuit against Ultra in Wayne County Circuit Court, claiming breach of contract and double damages under the Michigan Sales Representative's Commission Act ("MSRCA"). *See* Mich. Comp. Laws § 600.2961. Ultra removed the case to this Court. *See* 28 U.S.C. § 1332(a)(2).

The Court referred the matter to a magistrate judge for all pretrial proceedings. On November 24, 2010, the Court reassigned this matter to the presiding judicial officer, pursuant to Administrative Order 10-AO-033. The parties made cross-motions for

summary judgment. During their motion practice, Ultra filed a motion to strike both Sieger's reply brief and a deposition Sieger submitted from a previously undisclosed witness. Sieger, in turn, asked for permission to file a sur-reply to its motion for summary judgment to respond to these concerns and to issues raised at oral argument. In a Report and Recommendation ("Report") dated August 31, 2011, the magistrate judge recommended that the Court to grant in part and deny in part both summary judgment motions. The magistrate judge also denied Ultra's motion to strike, and granted Sieger's motion to file a sur-reply. Both parties, as authorized by Civil Rule 72, filed objections to the Report's substantive conclusions.[1]

Ultra objects to the magistrate judge's findings that (1) the term "gross sales" in the contract includes amounts paid by Ultra's customers for packaging and engineering costs, and (2) that Ultra "intentionally" withheld certain commissions from Seiger under the MSRCA. Sieger objects to the magistrate judge's conclusions that (1) Ultra did not receive a "purchase order" for the "RT Program" from Lear in 2004,[2] and (2) that Sieger is not entitled to attorney fees. The Court will adopt in part and reject in part the finding on "gross sales," and adopt in full the rest of the Report.

## STANDARD OF REVIEW

Recommendations on dispositive motions rendered by a magistrate judge are reviewed pursuant to Civil Rule 72(b). The district judge who referred the motion is only required to perform a de novo review of the magistrate judge's findings if the parties "serve

---

[1] Counsel for Sieger took ill after the magistrate judge issued the Report. To give substitute counsel time to adequately prepare objections in order to preserve Sieger's rights on appeal, the Court waived the typical fourteen-day deadline for filing the objections.

[2] The Court deems Sieger's objections to the magistrate judge's treatment of depositions submitted by the parties to be part and parcel of their objection to the finding on the "purchase order" question.

2

and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2). Both parties filed specific objections to the Report which, taken together, constitute a challenge to all of its substantive findings. Accordingly, the Court will review the claims de novo.

Summary judgment is warranted "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" for purposes of summary judgment if proof of that fact would establish or refute an essential element of the cause of action or defense. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir.1984). A dispute over material facts is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To show that a fact is, or is not, genuinely disputed, both parties are required to either "cite[ ] to particular parts of materials in the record" or "show[ ] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The Court must take care, in evaluating the motion, not to weigh the evidence, because the purpose of summary judgment is to determine whether a triable claim exists. *Doe v. Metro. Nashville Public Schools*, 133 F.3d 384, 387 (6th Cir. 1998) ("[W]eigh[ing] the evidence . . . is never appropriate at the summary judgment stage.").

## BACKGROUND

I. <u>The Sieger / Ultra Contract</u>

Sieger and Ultra entered their agreement on February 22, 2000. The contract provided that Sieger would be the representative "for sales of *products* manufactured by [Ultra]" in the United States, Canada, and Mexico to a select group of companies, including

3

Lear. Sales Representation Agreement ¶ 1, ECF No. 36-3 (emphasis added). Another portion of the contract reaffirmed that Sieger's role was "to sell and promote the Company's *products*." *Id.* ¶ 2 (emphasis added). The term "products" was defined in an exhibit attached to the contract as "Plastic Components & Assemblies (Exclud[ing] all Prototypes, Design, Development, & Tooling Costs)." *Id.* Ex. B. Ultra agreed to pay Sieger a $4,000 monthly retainer, and a "monthly commission" on top of the retainer "of gross sales to the named Customers . . . less deductions, credits, returns, discounts, and freight on shipments." *Id.* ¶ 4.

The contract also had termination provisions relevant to this case. Either party could terminate the agreement with sixty days written notice to the other side. *Id.* ¶ 10. In the event of termination, Sieger would continue to receive commissions "for 30 months after the termination date for all invoices on all orders or releases in effect at the date of termination," and payment on "all billings for parts which were received or remitted for quotations prior to the termination . . . provided a purchase order is received within 120 days of the date of termination." *Id.* ¶ 11(a), (c).

II. <u>Dispute on Commissions for Certain Costs</u>

Sieger and Ultra began to argue about which sales items were to be included in the "gross sales" number used to calculate Sieger's commissions long before this litigation began. On November 26, 2003, Joe D'Angelo, an Ultra representative, sent an e-mail to Sieger president Gary Scypta claiming that Ultra was overcompensating Sieger because it was paying "commissions on packaging and ED&D [engineering design and development] costs." Scypta / D'Angelo E-Mail, ECF No. 36-4. The e-mail exchange shows that Scypta did not agree with this initial assessment, but there is no follow-up in the record as to how the disagreement was resolved. An affidavit from Gino Mastronardi, who

4

is a director of project management at Ultra, states that after this exchange, Ultra stopped computing commissions on amounts Ultra's customers paid for packaging, freight, and ED&D. Mastronardi Aff. I ¶¶ 6–7, ECF No. 36-5. The parties apparently agreed that this was proper at the time, but Sieger has since changed its position. While it concedes that freight costs are not part of the basis for computing commissions, Sieger continues to dispute packaging and ED&D costs passed along to Ultra's customers.

III.   Termination of the Agreement and Dealings with Lear

In early 2004, Sieger's lead representative on the Ultra account, Gary Scypta, was negotiating with Lear in an effort to make Ultra the components designer for Lear's "RT Program" in the 2007 model year. Initially, Lear was hesitant about bringing Ultra on board to perform the design work on the project. E-mail from Baltosiewich to Scypta, Feb. 2, 2004, ECF No. 38-6 (explaining Lear's problem with bringing new companies into the bidding). After some discussions with Frank Gregor, a purchasing manager at Lear, Scypta convinced Gregor to let Ultra in on the design bidding. E-mail from Gregor to Scypta, Feb. 19, 2004, ECF No. 38-7.

On February 24, in the midst of these negotiations, Ultra sent written notice to Sieger terminating their agreement. Letter to Sieger, ECF No. 39-4. This would have officially ended their relationship on April 24, pursuant to the sixty-day lead time clause in the parties' contract. During this period, Sieger was in the process of "winding down" their work as sales representatives, as the company was about to stop active sales operations due to a lack of business. Scypta 1/26 Dep. 9:1–6, 25:14–18, ECF No. 39-3; Letter to Sieger ("[W]e expect Sieger Enterprises to stop calling or soliciting our customers on behalf of Ultra during the notice period.").

Despite the cancellation of the representation agreement, Scypta sent supplemental bid information to Gregor on March 8 in an attempt to get Ultra back into the bidding for "RT Program" design work. E-mail from Scypta to Gregor, ECF No. 38-8. On March 12, Gino Mastronardi, a director of program management at Ultra and the individual responsible for handling the Lear account, submitted another, more aggressive proposal for performing the design work. *See* E-Mail chain of Frank Gregor & Gino Mastonardi, ECF No. 39-5. Lear informed Ultra on March 15 that it had failed to win the design work for the RT program, but could still be considered for the award of production on the parts. *Id.*

After this rejection, Ultra succeeded in convincing Lear to include them in the preliminary design and engineering on the "RT Program."[3] On April 15, Ultra and Lear entered an "Early Sourcing Target Agreement" ("ESTA") that gave Ultra the opportunity to engage in preliminary design and engineering work on the RT program. Mastronardi Aff. II, at ¶¶ 9–11, ECF No. 39-7. The parties disagree about the significance of this document. Ultra characterizes it as an agreement for preliminary design and engineering services that left open the possibility of purchase orders for production of the parts at a future date. *Id.* at ¶ 10. Sieger argues that the ESTA is actually the "equivalent" of a purchase order under the terms of their contract with Ultra.

The language of the document does not suggest a firm commitment to purchase components after the completion of the required design work. The ESTA explains that

---

[3] Sieger asserts on numerous occasions that it was responsible for Ultra landing the ESTA, and not Ultra. The actual history of correspondence shows that Lear changed its mind only after it rejected Sieger's overtures on March 8, well after the notice of termination issued. If Sieger did convince Lear to sign on with Ultra, it should have the documentation to prove it. In the absence of such information, the only fair inference to draw from the record evidence is that Sieger followed Ultra's directives by ceasing active sales representation of Ultra.

Ultra "is a *Candidate* to participate in the process outlined herein." ESTA 2, ECF No. 38-4 (emphasis added). It goes on to provide that

> Lear will have no further obligation, outside of incurred ER&D costs detailed within the Target Pricing Detail section of this ESTA, *if no Purchase Order for Production issue[s]* due to a change in program/subsystem/component direction; if your company is unwilling to continue with the Team and its objectives; or if Lear or your Company is unwilling/unable to carry out the responsibilities outlined in this Agreement.

*Id.* (emphasis added). In another section, it notes the consequences to Ultra "[s]hould the production not be awarded" after completion of the preliminary design and engineering work. *Id.* at 7.

Dueling affidavits are the primary extrinsic evidence regarding the meaning of the ESTA. Allan Kochanski, a former director of finance in Lear's purchasing department, explained that the ESTA form, along with other forms of documentation labeled "purchase order" were used "as contract forms for their arrangements with suppliers," depending on the complexity of the underlying project. Kochanski Aff. ¶ 3–4, ECF No. 41-3. "As a matter of course," such documents were not issued to more than one supplier. *Id.* at ¶ 5. An ESTA, he further explained, would "signif[y] the sourcing of the business to the supplier, *subject to the supplier's ability to meet all of the targets set forth in the ESTA.*" *Id.* at ¶ 6 (emphasis added). Kochanski did not profess to having any direct involvement with the dealings between Lear and Ultra.

Ultra responded to the Kochanski affidavit with another affidavit from Mastronardi. He claims that the ESTA at the center of this case "did not obligate Lear to issue a production purchase order to Ultra or otherwise award production of the subject component parts to Ultra." Mastronardi Aff. III at ¶ 10, ECF No. 47-5. When Lear eventually decided to award the production of parts to Ultra, they issued a "production purchase order" to Ultra for the parts. *Id.* ¶ 11; *see also* Production Purchase Order, ECF No. 47-3. Sieger has not

7

presented any evidence contradicting this understanding of how "purchase orders" that actually authorize the delivery of goods work in conjunction with the ESTA, which does not do so. On other occasions, Ultra received similar ESTA's from Lear, and was *not* awarded production of parts on programs in which they participated in preliminary design and engineering. Mastronardi Aff. III at ¶¶ 13–20 (describing an ESTA provided to Ultra from Lear in September of 2005 where Ultra ultimately failed to secure Lear's business); *see also* Early Sourcing Target Agreement, Sept. 1, 2005, ECF No. 47-2. Mastronardi claimed that on this particular project, Ultra was in competition with a number of potential suppliers who submitted preliminary design work, and production "purchase orders" were only awarded to Ultra after Lear approved of their work. Mastronardi Aff. III at ¶ 9. Again, Sieger presented no evidence contradicting such an understanding.

## DISCUSSION

I.   Contract Interpretation Issues

"'It is elementary that a contract must be construed so as to effectuate the intent of the parties when it was made.'" *Sobczak v. Kotwicki*, 347 Mich. 242, 249 (1956) (quoting *Kunzie v. Kibbelink*, 199 Mich. 308, 314 (1917)). If a contract's language is unambiguous, that is definitive proof of the parties' intent, and the contract will be enforced according to its terms. *Farm Bureau Mut. Ins. Co. of Mich. v. Nikkel*, 460 Mich. 558, 566 (1999). The Court is obliged to "'give effect to every word or phrase [of the contract] as far as practicable,'" and should not create ambiguities where none exist by reading parts of the contract in isolation. *Klapp v. United Ins. Grp. Agency, Inc.*, 468 Mich. 459, 453 (2003) (quoting *Hunter v. Pearl Assurance Co., Ltd.*, 292 Mich. 543, 545 (1940)). The Court may consider extrinsic evidence to determine the intent of the parties if the contract is ambiguous. *New Amsterdam Cas. Co. v. Sokolowski*, 374 Mich. 340, 342 (1965).

8

Because Ultra drafted the contract in question here, ambiguities in the contract should be resolved in favor of Sieger. *Shay v. Aldrich*, 487 Mich. 648, 673 (2010).

Both Sieger and Ultra moved for summary judgment. In a breach of contract action, the burden of proof rests on the plaintiff to establish the defendant's breach. *Keywell & Rosenfeld v. Bithell*, 254 Mich. App. 300, 357–58 (2002). Therefore, Sieger has a "substantially higher hurdle" than Ultra in establishing the propriety of summary judgment. Ultra need only show that Sieger cannot sustain this burden at trial. *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002).

### A. "Gross Sales": Commissions on Packaging and ED&D Costs

Sieger argued that packaging and ED&D costs charged to Ultra's customers should be included in the sum used to calculate Sieger's commissions. It claimed that no context is needed to understand the phrase "gross sales to the named Customers," which Sieger believes refers to the total monies received by Ultra from the targeted customers, less the items in paragraph four. Ultra responded that based on a reading of the contract as a whole, the term "gross sales" must refer to "sales" of its "products" alone, as defined in Exhibit B to the contract. Therefore, "sales" should not include the costs of anything other than what is described in Exhibit B, leaving out both of the items on which Sieger is requesting commissions. The magistrate judge accepted Sieger's reading of the contract and recommended that the Court grant Sieger's motion for summary judgment and deny Ultra's motion for summary judgment on that issue. The Court adopts the magistrate judge's recommendation as to packaging costs, but rejects it as to ED&D costs.

"Gross sales" is known in both law and accounting as the "total sales . . . before deductions for returns and allowances." Black's Law Dictionary 1365 (8th ed. 2004). But the parties could not have intended to rely on the literal meaning of "gross sales." If they

9

had, the language excepting "deductions, credits, returns, [and] discounts" would be redundant. But there is a deeper problem here with using the textbook definition of "gross sales." Suppose as an example that Ultra sold a different kind of product to the targeted customers in North America, without Sieger's assistance. Ultra's "sales" of those products would certainly be a part of their "gross sales to the named Customers." Nonetheless, it would completely defeat the intent of the contracting parties if Sieger were to be awarded commissions based on such sales.

The term "gross sales" must, therefore, be limited to "gross sales *of the products*" that Ultra authorized Sieger to distribute. What is meant by "products" is the true dispute between the parties in this case. The magistrate judge reasoned that because Sieger contracted to sell Ultra's "products" — "plastic components and accessories," excluding "prototypes, design, development [and] tooling costs" — "gross sales" should be defined as "the total amount billed to defendant's customers as the cost of the plastic components and assemblies." Report 27, ECF No. 50. Since packaging and ED&D costs are part of the "total amount billed . . . as the cost" of the plastic components and assemblies, the magistrate judge found, they cannot be excluded from "gross sales" without stripping "gross sales" of its core meaning. Ultra argues that if Sieger is limited to gross sales of "*the products*," it must adhere to the meaning of that term provided in the contract, which explicitly *excludes* "prototype, design, development [and] tooling costs." It also claims "packaging" costs should be excluded, but does not point to any explicit language excepting "packaging" from the definition of "product" or "gross sales."

The Court agrees with the magistrate judge's logic as applied to packaging costs. The contract does not except "packaging" from the definition of "product," and, absent such an exception, packaging costs can be considered part of the "gross sales" Ultra received for

10

the contractually-specified goods. Those funds cannot be excluded from the computation of commissions merely because they were not explicitly mentioned without altering the meaning of "gross sales" as being the "total sales" received by the company related to that particular good. But the Court will not adopt the recommendation with regard to ED&D costs. The contract can only be understood to cover "gross sales" of "the products," and "the products" is a term of art in the contract that excludes "prototypes, design, development [and] tooling costs."[4] It would defeat the plain meaning of the contract's language to, at once, acknowledge that "gross sales" must be limited to "plastic components [and] assemblies," while at the same time ignoring an explicit exception to that definition.

Moreover, this interpretation does not read the "gross" out of "gross sales." Rather, it limits the term to what the parties understood it to mean at the time they reached their agreement. Therefore, the Court will enter summary judgment for Ultra on "ED&D" costs, and for Sieger on "packaging" costs. A further hearing to compute Sieger's damages as a result of this error shall be conducted at a future date.

B. "Purchase Order"; The ESTA's Status Under the Contract

Sieger claims it is entitled to commissions arising from Ultra's contract to produce plastic components and assemblies for Lear's "RT Program." Ultra has refused to pay these commissions. The nub of their dispute is the characterization of the ESTA. Sieger argues that the document is a "purchase order," and as such, it falls under paragraph 11(c) of the contract, which entitles Sieger to commissions after termination of the contract "[f]or

---

[4] Contrary to Sieger's contentions, Gary Scypta's deposition testimony does not show that the phrase "prototypes, design, development, [and] tooling costs" is ambiguous. Rather, he *admitted* that the phrase was synonymous with ED&D. Scypta Dep. 36:9–16, ECF No. 51-2. The Court works from this straightforward premise, as well.

11

all billings for parts which were received or remitted for quotations prior to the termination . . . provided a purchase order is received within 120 days of the date of termination . . . ." Contract ¶ 11(c). Ultra responds that the ESTA was not a "purchase order" because it was only a commitment to engage in the preliminary design and engineering work on the project, and did not constitute a commitment on the part of Lear to purchase parts from Ultra. The Court agrees with the magistrate judge's conclusion that the ESTA was not a purchase order.

A "purchase order" is generally understood to be "[a] document authorizing a seller to deliver goods, with payment to be made later."[5] Black's Law Dictionary 1270. The ESTA's language is not consistent with an authorization to deliver goods. It explains that the recipient is "a *Candidate* to participate in the process herein outlined," along with other "selected suppliers" in a "joint effort" to meet Lear's design goals. ESTA at 2 (emphasis added). The document anticipates, but does not command, the issuance of "Purchase Orders for Production Parts in line with this Agreement," and contemplates that purchase orders may not issue *at all* if there is "a change in program/subsystem/component direction, if your company is unwilling to continue with the Team and its objectives, or if Lear or your Company is unwilling/unable to carry out the responsibilities outlined in this Agreement."

---

[5] Sieger makes significant efforts to generate a "latent ambiguity" in a phrase that is reasonably unambiguous. *City of Grosse Pointe Park v. Mich. Muni Liability & Prop. Pool*, 473 Mich. 188, 198 (2005) (discussing this concept in contract law). It attempts to redefine a "purchase order" as a "contract[ ] awarding business to a supplier," or a device that merely "lock[s] in a price and generally provide[s] for the ordering of tooling." Pl.'s Rep. 2, ECF No. 41. It claims that in "typical industry practice," the ESTA was actually the "purchase order," and the "Purchase Orders" (capitalized) mentioned in the ESTA were actually "releases" of items the parties already committed to produce.

These arguments run counter to the widely-accepted commercial meaning of the language used in the contract and the ESTA, and they are unsupported, if not flatly contradicted, by the conduct of the parties and the materials in the record. Unsupported assertions by counsel about what industry practice may or may not have been at the time the contracts were in force are not relevant considerations on summary judgment.

*Id.* The "Target Pricing Detail" also takes into consideration the possibility that production of the parts described in the ESTA might not be awarded. *Id.* at 7.

Mastronardi's affidavits confirm this understanding of the ESTA. He claims that "[t]he ESTA did not provide for Lear to purchase any component parts from Ultra," and "did not provide for Ultra to sell any parts to Lear." Mastronardi Aff. II at ¶ 9. Ultra did not receive the purchase orders for these parts until 2006. *Id.* at ¶ 13. It did not actually produce or sell the component parts until July 2007. *Id.* at ¶ 15. Moreover, Mastronardi explains that in September 2005, Ultra received a nearly-identical ESTA from Lear for a different design process. Ultra completed the preliminary design work in accordance with the ESTA alongside other potential suppliers, and was *not* awarded the production business after doing so.[6] Mastronardi Aff. III at ¶¶ 13–20; *see also* Early Sourcing Target Agreement, Sept. 1, 2005, ECF No. 47-2. Mastronardi's testimony is therefore consistent with both the conditional language of the ESTA and the general understanding of the term "purchase order" in the business world.

Sieger cannot show that there is a material, disputed question of fact that ought to prevent the Court from granting summary judgment to Ultra. Kochanski's affidavit does not contradict Mastronardi's description of the deal's structure. No one disagrees with Kochanski that the ESTA is a "contract" setting forth an "arrangement with a supplier," but in this case, it did *not* arrange for the purchase of parts. The ESTA provides, at most, a

---

[6] The ESTA is also inconsistent with the legal requirements for a contract for the sale of goods. Michigan's implementation of the Uniform Commercial Code requires a contract for the sale of goods valued at over $1,000 to contain a written quantity term which cannot be found in the ESTA. *Lorenz Supply Co. v. Am. Standard, Inc.*, 419 Mich. 610, 614 (1984). Scypta also admitted in his deposition that numerous items that are generally found in a purchase order were not included in the ESTA. *See* Def.'s Resp. & Rep. 13–14, ECF No. 39.

framework for the parties to agree to purchase orders that authorize the delivery of actual goods at a future date, but it does not arrange for such purchases on its own terms.[7]

It may be true, as "a matter of course," that an ESTA did not usually issue to more than one supplier. If Ultra had been the only party involved in the bidding, and the award of the production to Ultra was inevitable upon receipt of the ESTA, Sieger would have a stronger argument that the ESTA was the equivalent of a purchase order. But the record shows this was not so. Kochanski himself admitted it was a "conditional" sourcing of the business to the party performing the design work. Even that statement appears to be based on the assumption that no one generally competed with a party who received an ESTA, and that was not true in this instance. Initially, Lear kept Ultra out of the bidding for the RT Project business and told them that it had awarded the design ESTA to an "alternate source," but that it would have an opportunity to compete for production at a later date. E-mail from Gregor to Mastronardi, ECF No. 39-5. The only inference to be drawn from this information is that Ultra *was* in competition with others for Lear's design *and* production business, and when Lear relented and awarded them an ESTA, it by no means guaranteed Ultra would receive production orders for parts from Lear once the design process finished. Sieger has presented no evidence to the contrary on this issue, either, as the magistrate judge recognized. *See* Report 24 n.5.

Finally, the Court has no difficulty setting aside Sieger's argument that this result does not comport with the intent of the contracting parties at the time they entered the

---

[7] Sieger presents a heavily abridged version of the "Statement of Work" attached to the ESTA as evidence that "all anticipated work related to parts production." Sieger's Obj. 8–9, ECF No. 53. This states the obvious — the whole point of the preliminary design project was to prepare for the eventual production of parts by *somebody*. The work statement does nothing to undermine the reality that, at most, the ESTA created a framework in which an agreement to build parts could be reached, and did not itself constitute an agreement to produce parts.

14

agreement. As discussed earlier when resolving the issue of what expenses figured into the calculation of "gross sales," this was a contract based on the sale of *parts*, not the sale of engineering, design, and development services. A "purchase order," in the context of such a contract, can only mean a document authorizing the purchase of such "products." The ESTA anticipates that such an agreement may be reached at a future date and provides conditions under which it may take place, but it does not go as far as Sieger needs it to go. Accordingly, Sieger's objection on this point must be overruled.

II. "Intentional Failure to Pay"; Double Damages Under the MSRCA

The magistrate judge found that Sieger was entitled to double damages on those commissions still owed to it under the MSCRA. Ultra objects to this finding, claiming that its failure to pay these commissions to Sieger was not an "intentional" failure, as the statute requires. The Court will overrule this objection.

The relevant provision of the MSRCA provides:

A principal who fails to comply with this section is liable to the sales representative for both of the following:

(a) Actual damages caused by the failure to pay the commissions when due.

(b) If the principal is found to have *intentionally* failed to pay the commission when due, an amount equal to 2 times the amount of commissions due but not paid as required by this section or $100,000.00, whichever is less.

Mich. Comp. Laws § 600.2961(5) (emphasis added). The word "intentionally" has been interpreted to mean that the principal must "deliberately fail[ ] to pay a commission when due." *Kenneth Henes Special Projects Procurement, Mktg. & Consulting Corp. v. Cont'l Biomass Indus., Inc. (In re Certified Question)*, 468 Mich. 109, 114 (2003). Because "intent" only means "deliberateness" under the statute, a principal "is liable for double damages . . . even if [it] did not believe, reasonably or otherwise, that the commission was owed." *Id.*

15

Ultra claims that because Ultra and Sieger were laboring under a "mutual mistake" as to what commissions were owed, the failure to pay the commissions should be considered "inadvertence or oversight" on its part, and therefore, not "intentional." *Id.* at 118–19. But *Kenneth Henes* establishes that "mutual mistake" cannot be a defense under section 600.2961(5)(b). *Id.* at 114 ("There is no textual indication that a principal's good faith belief is relevant in making the determination that double damages are payable under the statute."). "Inadvertence," in the sense understood by *Kenneth Henes*, does not encompass cases where the failure to pay commissions arose because the principal had a sensible belief that they were not owed. In such a case, the principal is still consciously choosing to withhold the commission — that is, "intentionally" withholding it.

Ultra complains that the magistrate judge's interpretation reads the word "intentionally" out of the statute, and it does appear that under the law of *Kenneth Henes*, almost every failure to pay commissions will be subject to double damages. But the construction does not completely strip the word "intentionally" of meaning. For instance, if a commission was not paid because of a processing error on the part of principal, double damages could not issue because the principal did not "intend" for the commission not to reach the sales representative. In any event, the argument is unavailing because the magistrate judge did nothing more than apply the law as given by the Michigan Supreme Court. That court could not have been more explicit in its holding that good faith is not a defense under the MSRCA. Ultra's problems with that interpretation are not properly addressed to this tribunal. *United States v. Philp*, 460 F.3d 729, 732 (6th Cir. 2006) ("We apply state law as decided by the Michigan Supreme Court."). Therefore, the Court adopts the finding of the magistrate judge on the issue.

III.  Attorney Fees

Sieger objects to the magistrate judge's finding that it is not entitled to attorney fees under the MSRCA.  Under the MRCA, a "prevailing party" is entitled to "reasonable attorney fees and court costs."  Mich. Comp. Laws § 600.2961(6).  "Prevailing party" is defined by statute as one "who wins on *all* the allegations of the complaint or on all of the responses."  *Id.* § 600.2961(1)(C) (emphasis added).  When a statute involves a mix of remedies, courts only look to the resolution of the MSRCA claims to determine if the plaintiff is a "prevailing party."  *Peters v. Gunnell, Inc.*, 253 Mich. App. 211, 223 (2002) ("[A] party cannot be deemed a prevailing party . . . unless that party is found to have prevailed fully on each and every aspect of the claim or defense asserted under the [MSCRA]."); *see also King v. Triton Indus., Inc.*, No. 08-cv-1006, 2009 WL 4639334, at *16 & n.11 (W.D. Mich. Dec. 2, 2009) (awarding attorney fees to plaintiff that won on an MSRCA claim but lost on other claims in his complaint).  In this case, Sieger has not prevailed on all MSRCA claims asserted in the complaint, and therefore, it is not entitled to attorney fees and costs.

## ORDER

**WHEREFORE**, it is hereby **ORDERED** that the Report & Recommendation on the cross motions for summary judgment (docket no. 50) is **ADOPTED IN PART** and **REJECTED IN PART**.  The objections of Ultra (docket no. 51) are **OVERRULED IN PART** and **SUSTAINED IN PART**.  The objections of Sieger (docket no. 52) are **OVERRULED**.

**IT IS FURTHER ORDERED** that Ultra's motion for summary judgment (docket no. 36) is **GRANTED IN PART** with respect to the exclusion of ED&D costs from the computation of Sieger's commissions and the finding that the ESTA is not a "purchase order"; and **DENIED IN PART** as to all other claims.

**IT IS FURTHER ORDERED** that Sieger's motion for summary judgment (docket no. 38) is **GRANTED IN PART** with respect to the inclusion of packaging costs in the computation of their commissions and the award of double damages under the MSRCA; and **DENIED IN PART** as to all other claims.

**SO ORDERED**.

                                        s/Stephen J. Murphy, III
                                        STEPHEN J. MURPHY, III
                                        United States District Judge

Dated: September 30, 2011

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on September 30, 2011, by electronic and/or ordinary mail.

                                        Carol Cohron
                                        Case Manager